JORDAN, Circuit Judge,
concurring in the judgment.
In our ruling today, we are required to defer to the Department of Labor’s interpretation of the FMLA. While I concur in the judgment, I write separately to note my discomfort with our reasoning, which is dictated by the regimes of deference adopted by the Supreme Court in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and Auer v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 187 L.Ed.2d 79 (1997). The doctrine of deference deserves another look. Chevron and Auer and their like are, with all respect, contrary to the roles assigned to the separate branches of government; they embed perverse incentives in the operations of government; they spread the spores of the ever-expanding administrative state; they require us at times to lay aside fairness and our own best judgment and instead bow to the nation’s most powerful litigant, the government, for no reason other than that it is the government. The problems they create are serious and ought to be fixed.
Our nation’s founders embraced the idea that freedom is best secured by dividing governmental power into distinct, structurally separate components. James Madison famously wrote that “[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands ... may justly be pronounced the very definition of tyranny.” The Federalist No. 47; see also Rebecca L. Brown, Separated Powers and Ordered Liberty, 139 U. Pa; L. Rev. 1513, 1538 (1991) (noting that the constitutions of five states, including Virginia and Massachusetts, expressly separated governmental power in ways similar to the United States Constitution). The Revolutionary generation had learned by hard experience “that abandonment of separated powers led directly to the loss of accountable, impartial government, which, in turn, led inevitably to the loss of due process and individual rights.” Brown, supra at 1538; see also Martin H. Redish & Elizabeth J. Cisar, “If Angels Were to Govern”:' The Need for Pragmatic Formalism in Separation of Powers Theory, 41 Duke L.J. 449, 476 (1991) (observing that formal separation of powers is a prophylactic measure intended to prevent one branch’s accumulation and concentration of powers). Our Constitution was thus framed specifically to avoid the concentration of powers in the hands of a single branch of government. Chevron, however, has dramatically undermined that purpose.
Each branch of government was’ meant to act as a check on the other so that power is not exercised without accountability. See Perez v. Mortg. Bankers Ass’n, — U.S. -, 135 S.Ct. 1199, 1216, 191 L.Ed.2d 186 (2015) (Thomas, J., concurring) (“To the Framers, the separation of powers and checks and balances were more than just theories. They were practical and real protections for individual liberty in the new Constitution.”). The checking function of the courts is in our power of judicial review, it being “emphatically the province and duty of the judicial department to say what the law is.” Marburg v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). Yet, the Supreme Court has created a doctrine that requires judges to ignore their own best judgment on how to construe a statute, if the executive branch shows up in court with any *279 “reasonable interpretation made by the administrator of an agency.” Chevron, 467 U.S. at 844, 104 S.Ct. 2778.
As though that were not bad enough, our hands are also tied when an agency interprets or reinterprets its own rules. Those fetters were put in place by Auer v. Robbins, which extended judicial deference to an agency’s interpretation of its rules, even in the midst of litigation. 519 U.S. at 462, 117 S.Ct. 905 (1997). The result today is that agencies are entitled to deference for their interpretation of statutes and then to a further dose of deference for their interpretation of the rules and regulations they layer on top of those statutes.[1] All the while, federal courts are pushed further and further away from our constitutional responsibility to “say what the law is.”[2] Marbury, 5 U.S. at 177; see also Decker v. Nw. Envtl. Def. Ctr., 568 U.S. 597, 133 S.Ct. 1326, 1341, 185 L.Ed.2d 447 (2013) (Scalia, J., concurring) (arguing that Auer deference “violate[s] a fundamental principle of separation of powers — that the power to write a law and the power to interpret it cannot rest in the same hands”). Chevron and the cases that have followed and expanded on it, including Auer, thus “undermined our obligation-to provide a judicial check on the other branches, and ... subject[ ] regulated parties to precisely the abuses that the Framers sought to prevent.” Perez, 135 S.Ct. at 1213 (Thomas, J., concurring).
The deference required by Chevron not only erodes the rolé of the judiciary, it also diminishes the role of Congress. Under Chevron, “[statutory ambiguity ... becomes an implicit delegation of rule-making authority, and that authority is used not to find the best meaning of the text, but to formulate legally binding rules to fill in gaps based on policy judgments made by the agency rather than Congress.” Michigan v. Envtl. Prot. Agency, — U.S. -, 135 S.Ct. 2699, 2713, 192 L.Ed.2d 674 (2015) (Thomas, J., concurring). And we in the courts have abetted that process, largely “abdicating] our duty to enforce [the] prohibition” against Congressional delegation of legislative power to executive agencies. Dep’t of Transp. v. Ass’n of Am. R.R., — U.S. -, 135 S.Ct. 1225, 1246, 191 L.Ed.2d 153 (2015) (Thomas J., concurring). The consequent aggrandizement of federal executive power at the expense of the legislature leads to perverse incentives, as Congress is encouraged to pass vague laws and leave it to agencies to fill in the gaps, rather than undertaking the difficult work of reaching consensus on divisive issues.[3]
*280 Auer deference further accentuates the shift of power to the executive branch by encouraging agencies to promulgate regulations vague enough to allow administrators wide latitude in deciding how to govern. See Perez, 135 S.Ct. at 1212 (Scalia, J., concurring) (critiquing Auer deference because it encourages agencies to “write substantive rules more broadly and vaguely, leaving plenty of gaps to be filled in later, using interpretive rules unchecked by notice and comment” rulemaking). And govern they do, not merely by enforcing laws passed by the people’s representatives, but through their own vast and largely unaccountable power. It is, in fact, a growing power. Deference to agencies strengthens the executive branch not only in a particular dispute under judicial review; it tends to the permanent expansion of the administrative state. Even if some in Congress want to rein an agency in, doing so is very difficult because of judicial deference to agency action. Moreover, the Constitutional requirements of bicameralism and presentment (along with the President’s veto power), which were intended as a brake on the federal government, being “designed to protect the liberties of the people,” are instead, because of Chevron, “veto gates” that make any legislative effort to curtail agency overreach a daunting task. Randy R. Barnett, Our Republican Constitution: Securing the Liberty and Sovereignty of We the People, 212 (2016).
In short, Chevron “permit[s] executive bureaucracies to swallow huge amounts of core judicial and legislative power and concentrate federal power in a way that seems more than a little difficult to square with the Constitution of the [Fjramers’ design.” Gutierrez-Brizuela v. Lynch, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring). That deterioration in the separation of powers is not merely a matter of abstract concern over political theory. The point of structural separation is, again, the protection of individual liberty. See NLRB v. Noel Canning, — U.S. -, 134 S.Ct. 2550, 2559, 189 L.Ed.2d 538 (2014) (“We recognize, of course, that the separation of powers can serve to safeguard individual libertyf.]”). “The doctrine of the separation of powers was adopted by the Convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power.” Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 629, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Douglas, J., concurring) (quoting Myers v. United States, 272 U.S. 52, 293, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (Brandéis, J., dissenting)).
When the power to create and interpret and enforce the law is vested in a single branch of government, the risk of arbitrary conduct is high and individual liberty is in jeopardy. An agency can change its statutory interpretation with minimal justification and still be entitled to full deference from Article III courts. See Nat’l Cable & Telecomms. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 981, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (“Agency inconsistency is not a basis for declining to analyze the agency’s interpretation under the Chevron framework.”). Citizens are therefore left to the mercy of government functionaries who are free “to bend existing laws, to reinterpret and apply them retroactively in novel ways and without advance notice.” Gutierrez-Brizuela, *281 834 F.3d at 1149 (Gorsuch, J., concurring). We would never allow a private litigant the power to authoritatively reinterpret the rules applicable to a dispute, yet we routinely allow the nation’s most prolific and powerful litigant, the government, to do exactly that.[4] Agencies can make the ground rules and change them in the middle of the game.[5]
I am not arguing that there is no role in our system of government for deference to administrative agencies. They unquestionably have institutional expertise that allows them to understand some provisions of law “based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case.” Skidmore v. Swift & Co., 323 U.S. 134, 139, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Such expertise may give agencies and the courts assistance when confronting technical issues. So, for instance, the Federal Energy Regulatory Commission is well qualified to determine what is the “just and reasonable” rate that utilities should pay when purchasing energy from other energy-producing facilities. Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp., 461 U.S. 402, 415, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983). Likewise, the Treasury Department is in a good position to say whether certain revenue qualifies as “reserve strengthening.” Atl. Mut. Ins. Co. v. C.I.R., 523 U.S. 382, 389-91, 118 S.Ct. 1413, 140 L.Ed.2d 542 (1998). And the Department of Energy can helpfully suggest whether “oil produced from tar sands” includes oil produced using enhanced extraction techniques. Shell Petroleum, Inc. v. United States, 182 F.3d 212, 217 (3d Cir. 1999). But Supreme Court precedent before Chevron already granted the “rulings, interpretations and opinions” of agencies a level of deference consistent with “the thoroughness evident in [the particular decision under] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.” Skidmore, 323 U.S. at 140, 65 S.Ct. 161. That level of deference appropriately takes into account an agency’s specialized knowledge while retaining for the judiciary the prerogative “to say what the law is.” Marbury, 5 U.S. at 177.
Highly specialized or technical matters are far different, however, than the legal matters on which federal courts are now routinely told, in the name of Chevron, to bow down and obey the executive branch. The facts of this case illustrate the prob *282 lem. The Department of Labor is entitled to tell us where, in a vaguely worded portion of the Family and Medical Leave Act (FMLA), we are to look for a prohibition on retaliation against employees who take FMLA leave. Consequently, even though we determined years ago that retaliation claims arise under 29 U.S.C. § 2615(a)(2), Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 n.9 (3d Cir. 2004), we must now defer to the Department of Labor’s final rule concluding otherwise.[6] Then, after deferring to the Department’s decision about which provision of the statute we are supposed to interpret, we must again defer to the Department when it delineates the rules of proof regarding such a claim and the kind of jury instruction that must be given.[7] So much for the job of the judicial branch.
Were we free to actually interpret the law rather than merely defer to an executive agency, we might well conclude that the FMLA does not allow for a mixed-motive instruction for Egan’s retaliation claim. “Causation in fact — i.e., proof that the defendant’s conduct did in fact cause the plaintiffs injury — is a standard requirement of any tort claim.” Univ. of Tex. Sw. Med. Ctr. v. Nassar, — U.S. -, 133 S.Ct. 2517, 2524, 186 L.Ed.2d 503 (2013). Therefore, “[a]bsent some reason to believe that Congress intended otherwise,” Gross v. FBL Fin. Servs. Inc., 557 U.S. 167, 177, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009), an employee must prove that a “prohibited criterion was the but-for cause of [an employer’s] prohibited conduct.” Nassar, 133 S.Ct. at 2523. While the terms of the FMLA do not expressly foreclose a mixed-motive instruction, cf. Gross, 557 U.S. at 176, 129 S.Ct. 2343 (emphasizing that the prohibition in the ADEA against discrimination “because of’ an impermissible consideration was synonymous with a requirement of “but for” causation' and foreclosed a mixed-motive instruction), neither do they mandate or even encourage such an instruction, cf. Nassar, 133 S.Ct. at 2534 (emphasizing that the prohibition in Title VII against retaliation when an impermissible characteristic was a “motivating factor” clearly permitted a mixed-motive instruction). Therefore, the default standard of “but for” causation seems to be applicable and a mixed-motive instruction would seem out of order.[8] Neverthe *283 less, because the Department of Labor has interpreted the statute differently, we are obliged to fall in line and adopt a standard for FMLA claims that Congress has never .embraced.
The consequences of this particular distortion of government functioning are foreseeable. As the Supreme Court noted in Nassar, “claims of retaliation are being made with ever-increasing frequency” and “lessening the causation standard could ... contribute to the filing of frivolous claims, which would siphon resources from efforts by employer[s], administrative agencies, and courts to combat workplace harassment.” 133 S.Ct. at 2531-32. Allowing claims to go forward on the terms dictated by the Department of Labor is a shift in public policy that should be debated and crafted within the legislative branch rather than being announced by unelected officials in an administrative agency. Yet, based on the judgment of someone inside the Department tasked with enforcing the FMLA, and despite the District Court’s effort to say what the law is, employers will now face a lower threshold of liability than they would have under the default causation standard. It is worth pondering how we arrived at this point,[9] The trajectory is more important than the result in this particular case.

. Agencies can also play a large role in the drafting and vetting of legislation, even before it is enacted, so they will at times have three bites at the law-making apple. See Christopher J. Walker, Legislating in the Shadows, 165 U. Pa. L. Rev. (forthcoming 2017), available at https://ssm.com/abstract=2826146 (presenting the results of extensive interviews and surveys with twenty federal agencies).

. Several states have expressly rejected the Chevron framework and their courts have refused to defer to state agency interpretations of state law. See, e.g., Hughes Gen. Contractors, Inc. v. Utah Labor Comm’n, 322 P.3d 712, 717-18 (Utah 2014) ("openly repudiating] ” Chevron deference to agencies and "retaining] for the courts the de novo prerogative of interpreting the law, unencumbered by any standard of agency deference”); In re Complaint of Rovas Against SBC Mich., 482 Mich. 90, 754 N.W.2d 259, 272 (2008) ("|T]he unyielding deference to agency statutory construction required by Chevron conflicts with ... separation of powers principles ... by compelling delegation of the judiciary’s constitutional authority to construe statutes to another branch of government.”); Pub. Water Supply Co. v. DiPasquale, 735 A.2d 378, 382 (Del. 1999) (“Statutory interpretation is ultimately the responsibility of the courts.”).

.As well stated by Representative Bob Good-latte, Chairman of the House Committee on the Judiciary, Chevron deference "tempts Congress to let the hardest work of legislating *280 bleed out of Congress and into the Executive Branch, since Congress knows judges will defer to agency interpretations of ambiguities and gaps in statutes Congress did not truly finish.” The Chevron Doctrine: Constitutional and Statutory Questions in Judicial Deference to Agencies: Hearing before the H. Subcomm. on Regulatory Reform, Commercial and Antitrust Law of the Committee on the Judiciary, 114th Cong. (March 15, 2016) (Prepared Statement of the Honorable Bob Goodlatte).

. The authority that agencies have to create binding law and reinterpret it at will may be heard as an echo of the royal prerogative to issue proclamations and interpret laws, a power claimed by British monarchs and widely rejected by Parliament and common law judges during the fatter half of the 17th century. See Philip Hamburger, Is Administrative Law Unlawful?, 33-63 (2014).

. The Supreme Court has declared that deference is inappropriate when an agency's reinterpretation of its regulation is “nothing more than a 'convenient litigating position’ ... a 'post hoc rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack,” or would result in “unfair surprise.” Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 132 S.Ct. 2156, 2167-68, 183 L.Ed.2d 153 (2012) (citations omitted) (second alteration in original). In practice, however, deference is granted even to an agency's poorly reasoned post-hoc rationalizations. See Columbia Gas Transmission, LLC v. 1.01 Acres, More or Less in Penn Twp., York Cty., Pa., Located on Tax ID #440002800150000000 Owned by Brown, 768 F.3d 300, 316 (3d Cir. 2014) (Jordan J., dissenting) (critiquing the majority opinion for accepting an agency's regulatory interpretation that the agency itself had once acknowledged was “at odds with ... the common understanding” of the terms of the regulation and that was adopted in a footnote "in the middle of an unrelated rulemaking” as a “reaction to the District Court’s decision in [that] case”).

. Even the Department of Labor recognized that "section 2615(a)(2) of the Act also may be read to bar retaliation^]” Dep’t of Labor Rules and Regulations for the Family Medical Leave Act of 1993, 73 Fed. Reg. 67934-01 (Nov. 17, 2008) (to be codified at 29 C.F.R. pt. 825). But, because the Department "believe[d] that section 2615(a)(1) provides a clearer statutory basis for § 825.220(c)'s prohibition of discrimination and retaliation^]” we are obligated to defer to that belief and limit our examination to § 2615(a)(1).

. The differences between "mixed motive” and "pretext” employment discrimination cases are ably described in the majority opinion. (Maj. Op. at 268 n.l.)

. Neither Section 2615(a)(1) nor (a)(2) contains causation language akin to either the "because of” language of the ADEA or the "motivating factor” language of Title VII. 29 U.S.C. §§ 2615(a)(1) — (2). Section 2615(a)(2) prohibits discrimination against an individual "for opposing any practice made unlawful by this subchapter.” Id. at § 2615(a)(2). A subsequent section, 2615(b), prohibits discharging someone "because such [an] individual” filed charges, gave information in an inquiry, or testified in a proceeding related to the rights protected by the FMLA — language closer to that found in the ADEA. Id. at § 2615(b). The best reading of Section 2615(a)(2) might thus involve reading the "for opposing” language in harmony with the "because” language from the subsequent section to conclude that "but for” causation is required. See Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 121, 120 S.Ct 1291, 146 L.Ed.2d 121 (2000) (noting that courts "must place [statutory] provision[s] in context, interpreting the statute to create a symmetrical *283 and coherent regulatory scheme”). Regardless, there is no language akin to "motivating factor” indicating that something less than “but for” causation is in order and so the default rule laid out in Gross and Nassar indicates that a mixed-motive instruction is not warranted.

. Some elected officials are taking note. Recently, Congress considered restoring full judicial review of agency action. On January 12, 2017, the House of Representatives passed The Regulatory Accountability Act of 2017, which, if passed by the Senate and signed into law, would prevent courts from deferring to certain agency determinations and instead require review of those determinations for "abuse of agency discretion.” H.R. 5, 115th Cong. .§ 107(c)-(d) (2017) (proposing amendments to 5 U.S.C. § 706).